# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WCP Solar Services LLC, | ) | Bankruptcy Number 22 B 7424 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge David D. Cleary |

### DEBTOR'S RESPONSE TO THE UNITED STATES TRUSTEE'S
### MOTION TO CONVERT OR DISMISS (DOCKET 47)

**NOW COMES** WCP Solar LLC. ("Debtor"), by and through its attorneys, Paul M. Bach and Penelope N. Bach of Bach Law Offices, Inc., and responding to the United States Trustee's ("Movant") Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b) ("the Motion") as follows:

### INTRODUCTION

Debtor is a limited liability company solely owned by Dr. Everton Walters ("Everton"). Debtor operates as a designer, developer, and installer of solar energy panels for public and private projects. The Debtor services residential, municipal, agricultural, educational, and commercial clients with an emphasis on commercial clients; however, other than an occasional maintenance request, the Debtor no longer works with residential projects. Due to circumstances created by the Covid-19 pandemic, the Debtor continued to operate throughout the pandemic, however the mandated lockdowns and subsequent staffing difficulties caused operations to stall and therefore projects were not completed timely.

Customers and vendors became concerned and several lawsuits were filed in order to recover alleged losses due from the Debtor. (A combined debt in the sum of approximately $4.5 million dollars.) Debtor attempted to rebuild and restructure to meet all his obligations; however, the litigation became over-burdensome and caused Debtor more hardship. As the Debtor was hoping to rebuild and pay all

1

creditors in full, the Debtor decided to file a Chapter 11 – Sub Chapter V case in order to restructure and provide as much in payments to creditors as cash-flow allows. This decision was made, as the Debtor felt strongly that there was a better chance of unsecured creditors being paid through a Chapter 11 Plan, than the an orderly liquidation of the Debtor.

In filing its Motion to Dismiss or Convert, the United States Trustee's Office share multiple facts of concern. In this Response, the Debtor will explain the reasons certain actions were taken and what action has been taken to remedy any such error, misunderstanding, or business decision.

## RESPONSIVE FACTS

The enumerated facts below are abridged facts from the Motion and enumerated solely for the purposes and making explanations and details clear and succinct.

1. *Everton manages the day-to-day affairs of and is in control of the Debtor*.

It did appear from the meeting of creditors that Everton was not only the sole owner of the Debtor and also the head of all operations. This is in fact not true. Leila Walters ("Leila")(also known as Terry Walters), has been running all financial operations as the CFO since May 2015. All financial matters were under her purview and direction. *See exhibit A – letter dated December 5, 2022 explaining the role of Leila*

2. *The Debtor obtained two PPP loans. The first PPP loan was in the amount of $267,627 and was funded in 2020. That first loan has been forgiven. The second PPP loan was in the amount of $689,966 and was funded in 2021. Of the second PPP loan, all but $180,952.04 has been forgiven.*

This is an accurate statement as to the loan forgiveness of the Debtor's PPP loan. All of the money the Debtor was provided was used for operational expenses. In order for Debtor did not qualify for 100% loan forgiveness, it would have needed to spend $609,561.45 on payroll. However, Debtor only spent $365,736.87 on payroll, so it only qualified for a partial loan forgiveness. This in no way an

2

indication that the funds were used inappropriately. No salary was been paid to Everton or Leila since early 2021 (with the exception of a payment in July that is discussed below).

3. *From July 2021 through July 2022, the Debtor's principal, Everton, caused the Debtor to make payments to him in the amount of $94,819.60.*

Attached as Exhibit B to this Response is a breakdown of all monies paid to Everton since January, 2021. None of these funds were used for personal expenses. Everton used his personal accounts to cover operational expenses and the Debtor reimbursed him for these charges.

4. S*imilarly, on June 9, 2022, Everton caused the Debtor to pay him $20,000.*

Attached as Exhibit B to this Response is a breakdown of all monies paid to Everton since January, 2021. The $20,000 was not used for personal expenses and is also part of the same calculation listed in paragraph 3 above. This statement shows on June 9, 2022 a deposit back into the Debtor's operation account of $8,500.00 as well as many expenses that were incurred by Everton on his personal accounts.

5. *On July 7, 2022, the Debtor began issuing checks to satisfy pre-petition obligations and did not take steps to prevent prepetition checks from clearing post-petition.*

Leila was confused about the responsibilities of a Debtor in Possession, and was fearful that, based upon various threats of creditors, that if she did not make payments on their balances that additional lawsuits would be filed. It was not until the week of August 21, 2022 that the Debtor understood that the threats of action were in violation of 11 USC 362, and that all the creditors will be treated in the Plan of Reorganization. See attached Exhibit C – a listing of payments made on pre-petition bills.

6. On July 7, 2022, the Debtor paid Everton $25,454.37. (Everton directed that the Debtor make that payment) and Leila was paid the sum of $4,315.89.

Attached as Exhibit B to this Response is a breakdown of all monies paid to Everton since January, 2021. The $23,854.37 went to operational expenses and the $1,600.00 was paid out to a landscaping bill. Additionally, the payroll check to Leila was for payroll due May 2021. These payments were made by Leila as the CFO prior to her understanding of a Debtor in Posession's duty to the bankruptcy estate. *See attached Exhibit C – a listing of payments made on pre-petition bills.*

7. *On July 13, 2022, the July operating report showed a $13,663.82 payment to WCP Realty, the entity that owns the Debtor and that Everton owns.*

The July operating report had the entry coded wrong and subsequent operating reports show the payment of $13,663.82 was a transfer into the Debtor in Possession bank account FNBO 0873. *See attached Exhibit C – a listing of payments made on pre-petition bills.*

8. *In addition to the payments to the insiders, the Debtor also paid: (i)its landlord, (ii)past due wages, and (iii)pre-petition vendors.*

Attached as Exhibit C to this Response is a breakdown of all monies paid on pre-petition bills in July 2022. Leila misunderstood what happens with the lease and priority claims. Leila understanding was that if she did not make the payment immediately to get current on the lease that the Debtor would be evicted. She also partially remembered a conversation that explained that unpaid wages were priority and a portion was required to be paid in full. She thought this mean she could send the payment. Payments in the filed Plan have been altered to reflect adjusted balances.

9. The Debtor has admitted that it paid or allowed to clear payments totaling over $103,898.62.

Neither Everton nor Leila have the means to reimburse the estate for the errors made in the beginning of the case. The Debtor's primary goal is to reorganize and get as much money to creditors as possible. To compensate the estate, both Everton and Leila have agreed to waive the balances of the claims due to them, as well as they are not taking any salary unless, WCP receives funds in excess of the amounts shown on the

projections attached to the current plan, and attached hereto as Exhibit D. The balances due to Leila is $224,768.77 in salary and cash advances. The amount due to Everton is $493,430.02 mostly salary. Everton and Leila has agreed to this even though the total amount was only $90,234.80 as $13,663.82 was a transfer into the Debtor in Possession account. This figure also does not include the deducted amounts from the priority debts as treated in the proposed Plan of Reorganization.

> 10. *Debtor indicated a $200 payment was made to Violet Financial Solutions, Inc. for preparation of pre-petition payroll tax returns and Debtor paid legal fees for an attorney of a creditor without proper retention pursuant to section §327.*

The payment to Violet Financial Solutions, Inc. was made by the Debtor prior to understanding the requirements of a Debtor in Possession. No payment has been made to Violet Financial Solutions, Inc. since this small payment. The Motion to Employ the accountant will be filed and scheduled for hearing with the Trustee's Motion to Dismiss as it has been determined that the estate will benefit from the accountant continuing to do quarterly reports and annual tax returns.

As to the small payment to Hunt & Subach, this was applying a previously paid retainer. No additional payments were made to Debtor's attorneys or an attorney of a creditor.

> 11. *The August MOR evidences improper payments. Exhibit E attached to this Response is the breakdown of payments, which cleared the Debtor in Possession account in August 2022.*

The four payments we listed on the exhibit were all made prior to the Debtor understanding the payment were improper. Two of these payments were quarterly taxes the Debtor believed had to be made. The other two were utilities that she believed services would be discontinued if they were not paid. These were the last of payments made on pre-petition accounts.

> 12. *The Debtor's omitted Philadelphia Indemnity Insurance Company ("PIIC") from its Schedules.*

It is true that the Debtor did not list PIIC as a creditor in its schedules. When PIIC appeared at the meeting of creditors, the undersigned did not see the communication from their counsel. The testimony

5

at the 341 meeting from the Debtor is to the best of his knowledge; that the Debtor did not owe any money to PIIC. The Debtor was shocked, when PIIC was mentioned. A potential breakdown in communication between the Debtor and its state court attorney, left out important details that caused the Debtor to believe there was no possible claim. Although this has been now clarified, there were many moving pieces and claims that the Debtor did not understand that were being filed. Through counsel, the Debtor discussed PIIC's claim and agreed upon verification that Claim would be treated in the plan. However, amended schedules were not filed by the time the Trustee filed this Motion, and the undersigned believed it was imperative to work through all the questions and concerns, so any amendments would be inclusive of all potential changes. The Debtor is also aware that the treatment in the Plan of PIIC is not proper as the undersigned did not see PIIC alleged the claim was secured. As such, an Amended Plan must be filed to correct the treatment of creditors.

13. *On September 13, 2022, that the Debtor provided a two-year budget explaining that the Debtor is still working on projections for the plan and that there would be changes. The budget contained line items that indicate that Everton and his wife would be paid more than $20,000 monthly. The two-year budget provided for payments of over $500,000 to insiders but only $61,000 would be available to fund a plan during that same time.*

As explained the both the United States Trustee's Office as well as Matthew Brash, Sub Chapter V Trustee, the budget tendered on September 13, 2022 was the proposed operational budget based upon the approved compensation from September 8, 2016. The undersigned explained that these amounts would be removed. Additionally, the preliminary budget that was tendered to Movant did not include the projected revenue from projects currently being negotiated. *Attached to this Response as Exhibit D is the detailed budget that was filed with the Plan.*

6

**ARGUMENT**

11 U.S.C. §1112(b) states in relevant part,

"(1) … on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause … (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) - (i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court."

Section 1112(b) lists a number of possible examples of cause, in the fact section above, the Debtor states the facts to show why none of the possible examples of cause apply to the case at bar. For clarity there are reasons not stated specifically in the statute the Court might consider, but they do not apply to the case at bar. Other examples of cause are: unreasonable delay by the debtor that is prejudicial to creditors; failure to propose a plan under section 1121 within any time fixed by the court; denial of confirmation of every proposed plan and denial of additional time for filing another plan or a modification of a plan; revocation of an order of confirmation under 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title; inability to effectuate substantial consummation of a confirmed plan; material default by the debtor with respect to a confirmed plan; and termination of a plan by reason of the occurrence of a condition specified in the plan.

Congress in H.R.Rep. No. 95-595, 95th Cong., 1st Sess., at 405-06 (1977) it its House Report states that the list of possible bases for cause "is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H.R.Rep. No. 95-595, 95th Cong., 1st Sess., at 405-06 (1977), U.S.

7

Code Cong. & Admin. News 1978, pp. 5787, 6362; see *In re Nancant, Inc.*, 8 B.R. 1005 (Bankr.D.Mass.1981). *See Jartran, Inc., In re*, 886 F.2d 859 (7th Cir. 1989)

The initial burden to demonstrate "cause" under § 1112(b)(1) lies with the movant, and that burden must be shown by a preponderance of the evidence. *In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013) citing *In re Draiman*, 450 B.R. 777, 826 (Bankr.N.D.Ill.2011). However, "once the movant shows cause, the burden shifts to the debtor to establish one of two exceptions in §1112(b)." Id. §1112(b)(2) provides that the court may not convert or dismiss a Chapter 11 case if it is not in the best interest of the creditors, and, the Debtor can establish all of one of the enumerated requirements set forth in subsections (A) and (B). *Id*. citing 11 U.S.C. § 1112(b)(2).

Movant states several reasons in which they believe cause exists to convert (or dismiss) this case. Movant is wrong. No actions by the Debtor give rise to cause. This Court has the discretion to decide if there are unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that (A) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor … for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court.

The primary allegations made by Movant are: 1) The Debtor engaged in gross mismanagement by paying pre-petition obligations post-petition; 2) Everton has breached his fiduciary duties by making unauthorized post-petition payments to himself on account of the Debtor's pre-petition obligations to him; 3) Everton is a creditor of the estate and has shown

that he cannot comply with his fiduciary obligations; 4) Realty, which is wholly owned and controlled by Everton, was a creditor of the estate; 5) The Debtor failed to make full and proper disclosures in its Schedules and Statement of Financial Affairs; and 6) Debtor failed to timely file its July monthly operating report, which constitutes cause under 11 U.S.C. § 1112(b)(4)(F). All the allegations set forth in the motion are discussed in detail above in Responsive Facts.

In summary, the Debtor made payments to pre-petition debt but not with any improper intent. The Debtor made these payments thinking they had to. Once the error was explained to the Debtor, no further payments were made improperly. Additionally, the payments made to the Debtor's principle was reimbursement for operational expenses. Without this payment, the Debtor would not have been able to remain in business. The payment to Leila was for May 2021 income. She also did not just pay herself, but paid something to ALL wage claims, believing this was a proper action.

In compensation to the Estate, Everton and Leila waved their entire balances due of unpaid wages and advances to the company. This amount is almost $800,000.00 between the two of them. As Everton and Leila have received no compensation for over 18 months, they simply have no means to reimburse the Estate.

WCP Realty did not receive any funds in July 2022. The money discussed in the Motion was actually a transfer to the Debtor in Possession account. Therefore, no wrongful act was there outside of the mis-labeled computer entry.

The errors on the schedules and statement of financial affairs, have not been filed to date, as it seemed improper to make such changes with a pending Motion to Dismiss. The Debtor is prepared to file these amendments, instanter.

9

Lastly, the July operating report was filed late. The Debtor provided a timely report, but the report was not filled out correctly. The Debtor in its first month struggled to understand what the report was supposed include, and was filled in using the accrual method which made the report confusing to follow. There was an excusable reason for the late filing as the Debtor needed to updated the bookkeeping to make a report based upon a cash basis.

Movant argues that in addition to the items above, that, "the Bankruptcy Code is clear – all activity outside of the ordinary course of business must first be approved by the Court before the action can be undertaken. See 11 U.S.C. §363(b)(1)." Debtor does agrees with this portion of Movant's statement. However, Debtor disagrees that any monies used outside the ordinary court of business. The Debtor believed it had to make these payments to stay in business and also believed that cancelling payment would cause bounced checks and additional legal concerns. Even if the Debtor was mistaken, the Debtor did not understand the protections of the Bankruptcy code at that time. Every payment discussed by movant cleared within the 31 days of the case filing. As soon as the Debtor understood, these behaviors ceased.

As stated above, the amounts in question are not recoverable from Everton or Leila. However, to compensate the estate they waived over $800,000.00 in monies owed to them as well as future salary during the pendency of plan payments. This action in the Plan more than compensates the Debtor's Estate for the confusion that occurred in the beginning of the case.

Movant argues that breach of fiduciary duty by paying pre-petition claims and payments to insiders is cause to remove the Debtor in Possession. However, the picture drawn is more bleak that reality. The plan reduces the claims of anyone that was paid, very little was paid out to non-priority claims, and the payments to Everton was necessary to cover operational expenses. Morte importantly, these behaviors ceased once explained to the Debtor.

Lastly, Movant argues that conversion is in the best interest of creditors. This is false. PIIC filed a claim that is the value of all potential assets. This leaves no funds for priority and general unsecured creditors. However, the Debtor has been working hard and has several projects in the works. These projects will produce enough revenue to make payments to all creditors. The contracting process is a very long, difficult, and complicated process, which takes significant time and negotiations. These contracts are multimillion-dollar agreements with many of moving parts. The agreements discussed are still being negotiated, as both side are being careful to make sure the agreements are fair and comprehensive.

Everton continues to work through the difficulties and challenges that are unique to each of the projects' agreements. Currently, the Debtor has a Lake County contract has just completed legal review and is now out for signature, and another large contract (Kachi) that is working out final payment terms. These two projects alone will provide over $600,000.00 profit to the Debtor over a 24-month period.

The Debtor asserts that if the court believes that cause is a factual issue that an evidentiary hearing will be necessary for the court to hear and decide many of the factual disputes which are discussed in this Response.

**WHEREFORE**, Debtor, WCP Solar LLC., prays this Honorable Court denies the Trustee's Motion to Convert or Dismiss; and for such other and further relief this Court deems just and proper.

Respectively Submitted,
WCP Solar LLC.

DATED THIS THE 14TH DAY OF DECEMBER, 2022.    BY:    **/S/ PENELOPE N. BACH**
**BACH LAW OFFICES, INC.**
COUNSEL FOR DEBTOR(S)
P.O. BOX 1285
NORTHBROOK, IL 60062
PHONE: (847) 564 0808

11